IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA f/u/b/o
AAROW ELECTRICAL SOLUTIONS, LLC
*Plaintiff*,

                      *v.*                          Civil Action No. ELH-16-3047

CONTINENTAL CASUALTY COMPANY, *et
al.*,
    *Defendants*.

## MEMORANDUM OPINION

This case arises under the Miller Act, 40 U.S.C. § 3131, *et seq.* Plaintiff, the United States of America f/u/b/o Aarow Electrical Solutions, LLC ("Aarow"), a subcontractor, alleges that it provided labor and materials to Grunley Construction Company, Inc. ("Grunley"), the general contractor, for a project at the Social Security Administration complex in Woodlawn, Maryland, for which Aarow has not been paid in full. ECF 1. Therefore, on September 1, 2016, pursuant to the Miller Act, Aarow filed suit to recover on the payment bond issued by Grunley's sureties, Continental Casualty Company and Liberty Mutual Insurance Company. *Id.*

Four months later, on January 19, 2017, Grunley filed a motion to intervene as a defendant, pursuant to Fed. R. Civ. P. 24(a) and (b). ECF 14 ("Motion to Intervene").[1] Defendants join in the motion. ECF 21. Aarow opposes the Motion to Intervene (ECF 19, "Opposition"), and Grunley has replied. ECF 23 ("Reply"). In addition, Grunley filed a motion to stay the case, "pending the outcome of the Government claims and appeals process." ECF 16

---

[1] Along with the Motion to Intervene, Grunley submitted its proposed answer and a counterclaim against Aarow for breach of contract for filing the suit. ECF 14-1. If the Motion to Intervene is granted, Grunley requests that its proposed answer and counterclaim "be deemed filed in this Court." ECF 14 at 7.

("Motion to Stay").   Defendants consent to the motion (ECF 22) but Aarow opposes it (ECF 20, "Opposition to Stay").  Grunley has replied.  ECF 24 ("Reply–Stay").

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion to Intervene but I shall deny the Motion to Stay.

## I.        Factual Summary[2]

Grunley, as general contractor,[3] entered into a construction contract ("Prime Contract") with the United States, by and through the General Services Administration ("Owner" or the "Government") to perform electrical and other work at the Social Security Administration complex in Woodlawn, Maryland (the "Project").  ECF 1 ¶ 6.[4]  As a condition of the Prime Contract, and pursuant to section 3131(b) of the Miller Act,[5] Grunley obtained "a labor and material payment bond" (the "Bond"), secured jointly and severally by Continental Casualty Company and Liberty Mutual Insurance Company (collectively, "Sureties").  *Id.*  ¶ 7; *see also* ECF 1-1 (Bond).

---

[2] For the purposes of this Memorandum Opinion, it is unnecessary to review the factual allegations in detail.

[3] I use the terms general contractor and prime contractor interchangeably.

[4] The parties did not provide the Court with a copy of the Prime Contract.

[5] 40 U.S.C. § 3131(b) states, in pertinent part:

Before any contract of more than $ 100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government the following bonds, which become binding when the contract is awarded ...

(2) Payment bond. A payment bond with a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person.

On or about December 26, 2013, Grunley entered into a subcontract ("Subcontract") with Aarow. Among other things, Aarow agreed to perform certain electrical, fire alarm, and security work for the Project for the "lump sum price" of $3,945,743.00. ECF 1, ¶ 8; *see also* ECF 1-2 (Subcontract.).

Aarow claims that it remains unpaid for certain work it performed on the Project. ECF 1. In particular, Aarow contends: "In order to perform some of its electrical work on the Project, the Government, Grunley and Aarow scheduled a number of power outages so that the new electrical equipment and systems could be brought online and integrated into the existing systems. However, for reasons unrelated to Aarow, and in some cases unknown to Arrow, the Government cancelled and rescheduled some of the power outages." *Id.* ¶ 9. Aarow alleges that, "[a]s a result of the cancelled and rescheduled power outages, Aarow's work on the Project was delayed by a total of 115 days," and it incurred additional costs in the amount of $272,756.00. *Id.* ¶ 10. Aarow also claims that it incurred additional costs of $76,572.00 as a result of certain rescheduled fire alarm outages. *Id.* ¶ 14; *see also id.* ¶ 13.

According to Aarow, "through Grunley" it "requested compensation from the Government for the additional time and costs incurred as a result of the cancelled and rescheduled power outages." *Id.* ¶ 11. Then, by letter dated February 10, 2015, the Government "unilaterally increased" the Prime Contract price by $143,000.00, and "unilaterally increased the Project time by 112 calendar days," so as "to compensate Grunley (and Aarow) for the additional time and costs incurred as a result of the cancellation and rescheduling of the power outages." *Id.* Of the $143,000.00 awarded to Grunley by the Government, Grunley attributed $103,235.00 to Aarow's additional costs and paid that sum to Aarow. *Id.* ¶ 12. According to Arrow, a total of $246,093.00 remains due and owing for labor and materials that it provided, "relating to the

power and fire alarm outages . . . after providing credit for the partial payment of $103,235.00." *Id.* ¶ 15.

By letter dated June 15, 2016, "Aarow submitted its detailed narrative, proposal, and backup information relating to the additional monies due and owing to it for the labor and materials it rendered to the Project relating to the power and fire alarm outages (the 'Claim')." *Id.* ¶ 16. Two days later, by letter dated June 17, 2016, "Grunley elected to mark up Aarow's Claim and submitted Aarow's Claim to the Government." *Id.* ¶ 16. A copy of Grunley's "Certified Claim and Request for Final Decision", dated June 17, 2016, is docketed at ECF 1-3.

As discussed, *infra*, the Government's claims and appeals process is conducted pursuant to the Contract Disputes Act, 41 U.S.C. 7101, *et seq*. However, the Government has not yet reached a decision regarding the Claim.

Additional facts are included in the Discussion.

## II.    Discussion

### A.  The Miller Act

Before addressing the parties' arguments, it is helpful to review the Miller Act.

The Miller Act, 40 U.S.C. § 3131 *et seq.,* imposes certain obligations on the prime contractor on any "contract of more than $100,000 ... for the construction, alteration, or repair of any public building or public work of the Federal Government." 40 U.S.C. § 3131(b). Of import here, the Miller Act requires the contractor to furnish a payment bond, through a satisfactory surety, "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract." *Id.* § 3131(b)(2).

In *F.D. Rich Co., Inc. v. United States f/u/o Indus. Lumber Co., Inc.,* 417 U.S. 116, 122 (1974), the Supreme Court explained that, ordinarily, a supplier of labor or materials on a private

construction project could obtain a mechanic's lien, but such a lien "cannot attach to Government property." (Citing *Illinois Surety Co. v. John Davis Co.*, 244 U.S. 376, 380 (1917)). Because suppliers on government projects "are deprived of their usual security interest," the Miller Act "was intended to provide an alternative remedy to protect the rights of these suppliers." *F.D. Rich Co., Inc.*, 417 U.S. at 122. And, in *U.S. for Benefit & on Behalf of Sherman v. Carter*, 353 U.S. 210, 216–17 (1957), the Supreme Court explained:

> The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material. Thus the Act provides a broad but not unlimited protection.[]

To achieve these purposes, the Miller Act authorizes any "person that has furnished labor or material in carrying out work" under a Miller Act contract and who "has not been paid in full within 90 days after the day on which the person did or performed the last of the labor furnished or supplied the material" to bring "a civil action on the payment bond." 40 U.S.C. § 3133(b)(1). Such a civil action must be filed "in the name of the United States for the use of the person bringing the action." *Id.* § 3133(b)(3)(A). An action brought under 40 U.S.C. § 3133(b) "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." *Id.* § 3133(b)(4).

"Federal law, not state statute or common law principles, controls in Miller Act suits." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp., LLC*, 235 F. Supp. 3d 745, 756, n. 13 (D. Md. 2016); *see F.D. Rich Co., Inc.*, 417 U.S. at 127 ("The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law.").

**B. Motion to Intervene**

As noted, Grunley seeks intervention under Rule 24, which governs intervention. It provides, in relevant part:

> (a) INTERVENTION OF RIGHT. On timely motion, the court must permit anyone to intervene who:
>
> > (1) is given an unconditional right to intervene by a federal statute; or
> >
> > (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> (b) PERMISSIVE INTERVENTION.
>
> > (1) *In General.* On timely motion, the court may permit anyone to intervene who:
> >
> > > (A) is given a conditional right to intervene by a federal statute; or
> > >
> > > (B) has a claim or defense that shares with the main action a common question of law or fact.
> >
> > \*\*\*
> >
> > (2) *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

**1. Intervention of Right**

In *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), the Fourth Circuit explained the standard for intervention of right under Rule 24(a)(2). It said, *id.* at 349-50 (quoting *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991)):

> [A] district court must permit intervention as a matter of right if the movant can demonstrate "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation."

In addition to the three factors articulated in *Stuart*, "timeliness is [also] a 'cardinal consideration' of whether to permit intervention . . . ." *Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999) (citation omitted). When assessing the timeliness of a motion to intervene, the court "is obliged to assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the parties; and third, why the movant was tardy in filing its motion." *Alt v. U.S. EPA*, 758 F.3d 588, 591 (4th Cir. 2014). "The determination of timeliness is committed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *Id.*

In order to intervene as of right, a movant's interest in the action must be "'significantly protectable'" and a movant must "stand to gain or lose by the direct legal operation." *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). "With respect to the [adequacy] requirement [of Rule 24(a)(2)], the Fourth Circuit has indicated that an intervenor's burden of showing inadequacy of representation is 'minimal.'" *First Penn-Pac. Life Ins. Co. v. William R. Evans, Chartered*, 200 F.R.D. 532, 536 (D. Md. 2001) (quoting *Commonwealth of Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir.1976); alterations added). But, "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the [movant] must demonstrate adversity of interest, collusion, or nonfeasance." *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (alteration added); *see also Stuart*, 706 F.3d at 350.

When the existing party has a legal obligation to represent the interests of the intervenor, then the intervenor has the "'onerous'" burden of making a "'*compelling showing* of inadequate representation.'" *See In re Richman,* 104 F.3d 654, 660 (4th Cir.1997) (quoting *In re Thompson,*

965 F.2d 1136, 1142 (1st Cir.1992)) (emphasis in *In re Thompson*). Indeed, " "courts now presume that the principal is adequately represented by its surety because they both have the 'same ultimate objective,' *i.e.,* to avoid liability on the payment bond." *Atl. Refinishing & Restoration, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 272 F.R.D. 26, 30 (D.D.C. 2010).

Grunley contends that it has satisfied all of the requirements of Rule 24(a). ECF 14 at 3. Grunley posits that its Motion to Intervene is timely, because the Court's Scheduling Order of October 20, 2016 (ECF 12) set January 20, 2017, as the deadline for motions to join additional parties. ECF 14 at 3; *see also* ECF 12 at 1. Further, Grunley claims that it "has a direct and substantial interest in this action because if its Sureties are found liable to Aarow, the Sureties will turn to Grunley for indemnification." ECF 14 at 3 (citing *US. ex rel. MPA Canst., Inc. v. XL Specialty Ins. Co.,* 349 F. Supp. 2d 934, 937 (D. Md. 2004)). With respect to the remaining factors, Grunley states that its "ability to protect its interest may be impaired if not allowed to intervene in the case." ECF 14 at 3. Grunley explains, *id.*: "While the Sureties may defend against Aarow's claims, given Grunley's indemnification obligations to its Sureties, Grunley is effectively the party ultimately responsible for payment of the claims. The Sureties cannot adequately represent Grunley's interests. While the Sureties and Grunley have a common interest in defending Aarow's claims, the two parties' interests are not fully coextensive."

Aarow concedes that Grunley timely submitted its Motion to Intervene and that it has an interest in the transaction at issue. ECF 19 at 2. However, Aarow contends that "Grunley's interests are well represented by the Defendants, who have a vested interest in defending Aarow's claim as best as possible to ensure that they will be able to recover any monies awarded to Aarow from Grunley under their indemnity agreements. In fact, the Defendants are legally obligated by the surety's good faith obligations to its principal to adequately represent Grunley's

interests." *Id.* at 3.    In addition, Aarow argues that Grunley's proposed breach of contract counterclaim lacks merit because to the extent that certain provisions of the Subcontract bar Aarow from filing a Miller Act case, they are "void as a matter of law, and are unenforceable." *Id.* at 5.

Judge Chasanow's analysis in *United States ex rel. MPA Construction, Inc. v. XL Specialty Insurance Co.*, 349 F. Supp. 2d 934 (D. Md. 2004), a Miller Act case, is instructive.   In that case, the "National Institute for Health" ("NIH") awarded a contract to Jowett, Inc. ("Jowett"), a general contractor. *Id.* at 935.   Pursuant to 40 U.S.C. § 3131(b), Jowett obtained a payment bond from Defendant XL Specialty Insurance Co. ("XL"). *Id.* at 935-36.   Jowett subsequently entered into a subcontract with MPA Construction, Inc. ("MPA") for work on the federal project. *Id.* at 936.   Thereafter, MPA filed suit against XL, pursuant to the Miller Act, alleging that it remained unpaid for certain work it performed on the project.

Jowett moved to intervene as a defendant.   Judge Chasanow determined: "[Jowett]…clearly has a 'direct and substantial interest' in the transaction, because XL, if held liable, will turn to [Jowett] for indemnification." *Id.* at 937.   However, she observed that "[w]hether [Jowett's] interests would be impaired and whether [Jowett's] interests are adequately represented by XL are closer questions", *id.*, in part because of XL's "good faith obligation as surety" to "defend in the present action." *Id.* at 938.   Judge Chasanow concluded, however, that she need not resolve the issue, because permissive intervention was appropriate. *Id.*

Similarly, I need not resolve whether Grunley is entitled to intervene as of right in a suit brought by its subcontractor on a bond issued by its sureties.   This is because Grunley is entitled to permissive intervention under  Fed. R. Civ. P. 24(b)(1)(B).

### 2. Permissive Intervention

Even if Rule 24(a)(2) does not mandate intervention, a party may be entitled to permissive intervention under Rule 24(b). *See Stuart*, 706 F.3d at 349. The decision to grant or deny permissive intervention "'lies within the sound discretion of the trial court.'" *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003) (quoting *Hill v. Western Elec. Co. Inc.*, 672 F.2d 381, 386 (4th Cir. 1982)); *see also McHenry v. C.I.R.*, 677 F.3d 214, 219 (4th Cir. 2012).

In *Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.*, 223 F.R.D. 386 (D. Md. 2004), then-District Judge Andre Davis distilled, from "the text of Rule 24(b) itself [and] case law interpreting the rule," four conditions with respect to permissive intervention. They are as follows, *id.* at 387 (citations omitted; first alteration added, second alteration in *Shanghai Meihao Elec., Inc.*):

> (1) that [the intervenor's] motion is "timely"; (2) that its "claim or defense and the main action have a question of law or fact in common" . . . ; (3) that there exists an independent ground of subject matter jurisdiction; and, (4) that "intervention will [not] unduly delay or prejudice the adjudication of the rights of the original parties."

Grunley seeks permissive intervention under Rule 24(b)(1)(B), which permits the Court to allow anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." Grunley avers that its "claims and defenses relate to the same Project and work as the claims asserted by Aarow in its complaint." ECF 14 at 4 (citing *MPA Const., Inc.,* 349 F.Supp.2d at 938-39). Grunley also notes that if it is not permitted to intervene, "and Aarow prevails in this action, the Sureties will likely seek reimbursement from Grunley and Grunley will then be forced to seek recovery from Aarow. Accordingly, Grunley's intervention in this action will avoid multiplicity of suits." ECF 14 at 4.

In its Opposition, Aarow does not contest Grunley's assertion that its claim or defense shares a common question of law or fact with the main action. ECF 19 at 3. But, Aarow argues that permissive intervention would delay or prejudice the adjudication of the parties' rights, in contravention of Fed. R. Civ. P. 24(b)(3), because Grunley also filed a Motion to Stay "pending its resolution of its claim with the Government." *Id.* at 4. According to Aarow, "the driving reason behind Grunley's Motion to Intervene is to further delay Aarow's ability to recover payment for the labor and materials it rendered to the Project, and for which it has already been waiting for over three years." *Id.* Aarow concludes: "It would be manifestly unfair to further delay Aarow's right to recover monies for which it has been waiting over three years simply to allow Grunley to engage in the lengthy [Contract Disputes Act, 41 U.S.C. §7101 *et seq*., dispute resolution] process." *Id.*

Grunley maintains that the granting of the Motion to Intervene "would not substantially delay or prejudice the rights of Aarow" because it "timely moved to intervene under the current scheduling order and only minimal discovery has occurred to date." ECF 23 at 3. In addition, Grunley disputes Aarow's assertion that "'it has been waiting more than three years'" on its claim. ECF 23 at 4 n.3 (quoting ECF 19 at 4). It points out that, in its Complaint, Aarow acknowledges that the Government already paid a portion of the claim, and the claim "that is *currently* at issue was submitted by Aarow on June 15, 2016…." *Id.* (emphasis in ECF 23).

As noted, Grunley moved to intervene four and a half months after the suit was filed, and in accordance with the Scheduling Order (ECF 12). Aarow does not point to any prejudice or possible delay that will result from allowing Grunley to intervene. Nor does Aarow contest that Grunley's proposed counterclaim and defenses share common questions of law and fact with Aarow's suit against Grunley's sureties. Fed. R. Civ. P. 24(b)(1)(B).

I am satisfied that adding Grunley as a party will not "'unduly delay or prejudice the adjudication of the rights of the original parties.'" *Shanghai Meihao Elec., Inc.*, 223 F.R.D. at 387 (citation omitted). And, "in the absence of undue delay, intervention is appropriate to promote judicial efficiency." *MPA Construction, Inc.*, 349 F. Supp. 2d at 939. Here, intervention satisfies the "'goal'" of Rule 24 to "'prevent[] a multiplicity of suits that involve common questions.'" *Id.* (quoting citing *Mahurin's Const. Co. v. Granite Re, Inc.*, No. 04-2174-CM-DJW, 2004 WL 2249489, at *1 (D. Kan. Sept. 7, 2004)).

Accordingly, I shall grant permissive intervention under Fed. R. Civ. P. 24(b)(1)(B).

### C. Motion to Stay

#### 1. Stay Principles

A district court has broad discretion to stay proceedings as part of its inherent power to control its own docket. *Landis v. North American,* 299 U.S. 248, 254 (1936). But, that discretion is not without limits. *In re Sacramento Mun. Utility Dist.,* 395 F. App'x 684, 687 (Fed. Cir. 2010). A court must "weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 255; *see also United States v. Ga. Pacific Corp*., 562 F.2d 294, 296 (4th Cir. 1977) ("The determination by a district judge in granting or denying a motion to stay proceedings calls for an exercise of judgment to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket.").

In particular, the court must consider "the length of the requested stay, the hardship that that [sic] the movant would face if the motion were denied, the burden a stay would impose on the nonmovant, and whether the stay would promote judicial economy by avoiding duplicative litigation." *In re Mut. Funds Litigation*, JFM–04–1274, 2011 WL 3819608, *1 (D. Md. Aug. 25, 2011). In order to issue a stay, a court must be satisfied that a "pressing need" exists, and that

"the need for a stay outweighs any possible harm to the nonmovant." *Elite Const. Team, Inc. v. Wal-Mart Stores, Inc.*, JKB-14-2358, 2015 WL 925927, at *3 (D. Md. Mar. 2, 2015).

## 2. The Contract Disputes Act

Grunley seeks to stay this case pending the outcome of the Government claims and appeals process. That process is conducted pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. 7101, *et seq.* ECF 16.

The CDA establishes "an administrative process" in which the contractor first submits "its claims for payment to the government's contracting officer." *United States v. Zurich Am. Ins. Co.*, 99 F. Supp. 3d 543, 546 (E.D. Pa. 2015) (citing 41 U.S.C. § 605(a) (1978), *amended by* 41 U.S.C. § 7103)). A contractor is defined as "a party to a Federal Government contract other than the Federal Government." *Id.* § 7101(7).

Under the CDA, the contracting officer must issue a decision "within a reasonable time, ... taking into account such factors as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the contractor." 41 U.S.C. § 605(c)(3); s*ee also* 41 U.S.C. § 605(c)(2)(B) (For claims in excess of $100,000, the contracting officer "shall within sixty days of receipt of a submitted certified claim, ... notify the Contractor of the time within which a decision will be issued."). The contractor may appeal the contracting officer's decision to the Board of Contract Appeals, *id.* § 606, *amended by* 41 U.S.C. § 7104 (2011), or to the United States Court of Federal Claims. *Id.* § 609, *amended by* 41 U.S.C. § 7104.

Of import, "[u]nder the CDA contracting officers have jurisdiction only over claims by contractors against the government, not over claims brought directly by subcontractors." *NavCom Defense Elec., Inc. v. Ball Corp.,* 92 F.3d 877, 879–80 (9th Cir.1996) (per curiam). So, the subcontractor cannot directly utilize the CDA process. *Zurich American Insurance Co.*, 99 F.

Supp. 3d at 547.  The Fourth Circuit has said:  "The Government does not recognize or deal with the subcontractor and owes no obligation to him for the work he performs." *United States ex rel. B's Co. v. Cleveland Elec. Co. of S.C.,* 373 F.2d 585, 588 (4th Cir. 1967).  Therefore, "only the [prime contractor] has the right to submit factual issues to the Contracting Officer.... 'There is no procedure by which the claim of a subcontractor can be presented against the United States except as it may become a claim of the prime contractor, since there is no contract, express or implied, between the subcontractor and the government.'" *Beacon Constr. Co. of Mass. v. Prepakt Concrete Co.,* 375 F.2d 977, 981 (1st Cir.1967) (quoting *Fanderlik–Locke Co. v. United States,* 285 F.2d 939, 942 (10th Cir.1960)) (citation omitted); *see also* 41 U.S.C. § 7103(a).

"When a prime contractor submits a certified claim under the CDA, it is a claim for additional compensation to the prime contractor itself." *Zurich American Insurance Co.*, 99 F. Supp. 3d at 547.  Grunley has submitted such a claim (ECF 3-1); it seeks compensation for itself and on Aarow's behalf. *Id.*

### 3.  Grunley's Motion to Stay

Grunley's Motion to Stay is based on several provisions of the Subcontract by which Aarow allegedly agreed "that it was not entitled to damages for any delay unless Grunley recovered the cost from the Government and that payment by the Government was a specific condition precedent to payment by Grunley."  ECF 16 at 6.  In effect, Grunley contends that Aarow has no right to sue at this juncture.  In its view, until the CDA process has been completed, Aarow's claims are "premature" (*id.*)  because "Aarow is owed no damages unless and until the GSA contracting officer determines that Aarow is entitled to additional costs or—if the GSA contracting officer denies Aarow's claim and Grunley and Aarow decide to appeal that decision—a Board of Contract Appeals so finds." *Id.* at 9.  Therefore, Grunley urges the Court

to stay the case, claiming that Aarow has no damages under the Subcontract "unless and until" the contracting officer determines that Grunley is entitled to recover for additional costs incurred by Aarow. ECF 16 at 9.[6]

In its Opposition to Stay (ECF 20), plaintiff argues that courts that have considered motions to stay under similar factual circumstances have "consistently declined to enforce contractual pre-conditions to filing suit under the Miller Act when such pre-conditions contravene the purpose of the Miller Act." *Id.* at 3. They have reasoned that "[t]he only condition precedent to [a subcontractor's] ability to file its Miller Act claim is 'the passage of time.'…Any other conditions precedent to [a subcontractor's] right to file its Miller Act claim contravenes the rights afforded subcontractors under the Miller Act and are unenforceable." *Id.* at 9 (citation omitted, alterations added).

The Subcontract provides, ECF 1-2, Article 6 at 5 (emphases added):

> The Subcontract Sum shall be paid in partial payments, *when received by the Contractor from the Owner*, to Subcontractor for the payment for work in place and material on the jobsite. Payment from the Owner is a *specific condition precedent* to the Contractor's obligation to pay the Subcontractor, *the risks of nonpayment by the Owner being on the Subcontractor* for its portion of the work in place of material on the jobsite.

In addition, the Subcontract limits Aarow's damages for delay as follows, *id.*, Article 12 at 7 (emphasis added):

---

[6] Grunley notes in its Motion to Stay that the Contracting Officer's decision had been expected by January 25, 2017. ECF 16 at 9. However, the Contracting Officer was on maternity leave through April 2017, and as of this point her "final written decision has not been provided." ECF 20 at 3, n. 1; *see also* ECF 20-1 (Contracting Officer's out of office e-mail reply). Moreover, as discussed, *infra*, under Grunley's interpretation of the Subcontract, Aarow's right to sue depends on the outcome of the CDA process. *See* ECF 16 at 11 ("[T]he contractually bargained for dispute resolution process will finally settle the matter because, again, the Subcontract explicitly states that Aarow is not entitled to damages for delay unless Grunley recovers the damages from the Government.")

The Contractor shall not be independently liable to Subcontractor for any unforeseeable delay or interference occurring beyond the Contractor's control or for delay or interference caused by Owner or other subcontractors or suppliers. *Subcontractor shall only be entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner or others.* The Subcontractor shall have the right, at its expense, to exercise all provisions of the Prime Contract to recover said damages against the Owner. In the event that the Contractor seeks to recover damage for delay against the Owner or others and the Subcontractor participates in such claim, the Subcontractor shall be responsible for its pro rata share of any legal, expert, and/or other expenses in presenting and/or prosecuting the overall claims. The Contractor shall have the right, at any time and for any reason, to delay or suspend the whole or any part pf the Work herein. A time extension shall be the sole and exclusive remedy of the Subcontractor for delays or suspensions caused by Contractor, even if the delays or suspensions were (1) of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, or (3) were caused by active interference of Contractor or other subcontractors or suppliers.

And, with respect to Owner changes, the Subcontract states, ECF 1-2, Article 17, at 8

(emphasis added):

Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights do not interfere with the progress of the work. Payment for Owner changes shall be made in accordance with Article 6, and payment for Owner changes shall not be due the Subcontractor as a *specific condition precedent* until said payment is received by the Contractor from the Owner.

Finally, with respect to disputes, the Subcontract states, *id.* at Article 19, at 8:

Disputes arising out of Owner acts, omissions, or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise the Contractor's rights at the Subcontractor's sole cost and shall be bound thereby. The Contractor shall have no direct liability to the Subcontractor except to give the Subcontractor the opportunity to exercise the rights in the Prime Contract. The Subcontractor shall be required as a condition precedent to submitting a claim against the Owner to certify its claim in accordance with all certification requirements in the Prime Contract. Subcontractor agrees to indemnify and hold harmless the Contractor for any defects or misrepresentations in its certifications, including any relating to cost or pricing data.

These types "of conditional payment clause[s] in a subcontract agreement [are] commonly referred to by courts as a "pay-if-paid" or "pay-when-paid" clause." *Tusco, Inc.*, *supra*, 235 F. Supp. 3d at 751. Generally, such clauses "are 'used by general contractors to condition payment to their subcontractors upon the general contractor's receipt of payment from the owner.'" *Id.* at 751-52 (citation omitted). *See, e.g.*, *Universal Concrete Products v. Turner Const. Co.*, 595 F.3d 527, 529–32 (4th Cir. 2010) (noting that a clause making payment by the owner an "express condition precedent" to payment from the prime contractor to subcontractor is a "pay-when-paid" clause under Virginia law); *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1261–64 (10th Cir. 2006) (explaining that a provision making "all payments to Subcontractor by Contractor...expressly contingent upon...payment for the Work by Contractor from Owner" is a "pay-if-paid" clause under Texas law); *see also* Steven J. Koprince, *The Slow Erosion of Suretyship Principles: An Uncertain Future for "Pay–When–Paid" and "Pay–If–Paid" Clauses in Public Construction Subcontracts* ("Koprince"), 38 PUB. CONT. L.J. 47, 53–54 (2008).

The "pay-when-paid" and "pay-if-paid" clauses "are conceptually distinct," however. *Tusco, Inc.*, 235 F. Supp. 3d at 752, n.8. Judge Messitte explained in *Tusco, Inc.*, *id.*:

> A "pay-when-paid" clause makes payment by the owner a "timing mechanism" of payment to the subcontractor. *MidAmerica Constr.*, 436 F.3d at 1261. This type of provision generally "provides that payments by the general contractor to the subcontractor are not due until the owner pays the general contractor for the work performed by the subcontractor." Koprince, *supra*, at 54. A "pay-if-paid" clause, on the other hand, makes payment by the owner an "express condition precedent" in "clear and unequivocal language." *MidAmerica Constr.*, 436 F.3d at 1262. This type of contract term "transfers the risk of the owner's nonpayment to the subcontractor by providing that the subcontractor will be paid if, and only if, the owner pays the general contractor for the subcontractor's work." Koprince, *supra*, at 54.

The Ninth Circuit's decision in *United States for Use & Benefit of Walton Technology, Inc. v. Weststar Engineering, Inc.*, 290 F.3d 1199, 1208 (9th Cir. 2002), is noteworthy. Walton Technology, Inc. ("Walton"), a subcontractor on a federal construction project, filed suit against the prime contractor and, pursuant to the Miller Act, against the payment bond surety. Walton alleged that the prime contractor "failed to pay Walton rental fees for equipment it rented from Walton for use on the project." *Id.* at 1201. Before the lawsuit was filed, the subcontractor and the prime contractor entered into a settlement agreement, which included a clause providing that the prime contractor would make future payments to the subcontractor *only when and if* it received payment from the Navy. *Id.* at 1203. In particular, the relevant clause stated, in part: "[I]t is expressly agreed that any further payment to Walton for the framing and fabric rental *shall only be made when and if paid by the Navy* and only to the extent paid by the Navy…." *Id.* (alteration and emphasis in *Walton*). After the suit was filed, the defendants argued in a motion for summary judgment that they were not liable to the subcontractor because the "pay when and if paid" clause in the settlement agreement had not been satisfied. *Id.* at 1204.

Reversing the district court's grant of summary judgment in favor of defendants, the Ninth Circuit explained, *id.* at 1208:

> A subcontractor's right of recovery on a Miller Act payment bond accrues ninety days after the subcontractor has completed its work, not "when and if" the prime contractor is paid by the government. Permitting a Miller Act surety to avoid liability on the payment bond based on an unsatisfied "pay when and if paid" clause in the subcontract would, for all practical purposes, prohibit a subcontractor from exercising its Miller Act rights until the prime contractor has been paid by the government. In cases where the government does not pay the prime contractor within the one year statute of limitations period, the subcontractor would be barred from asserting its Miller Act rights.

*See also U.S. for Use & Benefit of T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Texas*, 942 F.2d 946, 949 n. 6 (5th Cir. 1991) (determining that, under the Miller Act, a "pay-

when-paid" clause does not preclude a subcontractor's recovery on the payment bond because "[t]he federal legislation conditions on the payment of the subcontractor not on payment by the government to the contractor, but rather on the passage of time from completion of the work or provision of materials"); *United States v. Holloway Co.*, 126 F. Supp. 347, 348 (D.N.M. 1954) ("Any contractual deviations from the objectives of the Miller Act, which cause or tend to cause unwarranted delay to good faith sub-contractors, are against the public policy of the Act, and should not afford an escape to those prime contractors who have secured insertion of the above covenants in contracts between them and sub-contractors.").

In *Tusco, Inc.*, 235 F. Supp. 3d 745, a subcontractor sued the general contractor for breach of contract and sued the surety under the Miller Act. The surety, Travelers Casualty and Surety Company of America ("Travelers"), moved to stay, joined by the contractor. The surety relied on certain provisions of the subcontract between the general contractor, Clark Construction Group, LLC ("Clark"), and its subcontractor, Tusco, Inc. ("Tusco"), including a conditional payment clause and a clause that set forth certain dispute resolution procedures. *Id.* at 757-58.

The conditional payment clause made payment by the government to Clark a condition precedent to payment by Clark to Tusco, "for work per change orders[.]" *Id.* at 751. It provided: "Clark's receipt of payment from the Owner on account of pending changes made by the Owner shall be a condition precedent to Clark's obligation to make payment for changed work to Subcontractor." *Id.* at 749. The dispute resolution clause established procedures as between Clark and Tusco with respect to "'any act or omission of the Owner or involving the Contract Documents.'" *Id.* at 757 (citation omitted). Travelers argued that "because its liability for payment of the bond is derivative of Clark's, and because Tusco agreed…to 'be bound to

Clark to the same extent that Clark is bound to the Owner,'" the parties were obligated to follow the dispute resolution procedures set forth in Article 11(b) before pursuit of any claims against the surety. *Id.* at 758.

Judge Messitte rejected this argument and denied the stay, recognizing that "any stay of Tusco's lawsuit could impede its Miller Act rights…." *Id.* at 761, n. 21. The court explained, *id.* at 759: "The Miller Act gives a subcontractor the right to sue a payment bond's *surety* based 'on the passage of time,' not on the payment from the federal government to a prime contractor." (quoting *Walton*, 290 F.3d at 1205; emphasis in *Tusco, Inc.*). The court was of the view that "sureties generally cannot enforce conditional payment clauses in a subcontract because such clauses abrogate subcontractors' rights under the Miller Act." *Id.* at 753, n. 10.

Relying on a host of cases, Judge Messitte said, *id.* at 756 (emphasis added): "When a surety attempts to enforce its principal's (the prime contractor's) conditional payment clause, federal courts that have addressed the issue have unanimously held that a surety is *not* entitled to the benefits of its principal's pay-when-paid or pay-if-paid clause." Further, the court said, *id.* at 756-57 (bold added):

> As the Ninth Circuit has explained, "by the express terms of the Miller Act a subcontractor's right of recovery on a Miller Act payment bond is conditioned on the passage of time from completion of work or provision of materials." *U.S. for Use and Benefit of Walton Tech., Inc. v. Weststar Engineering, Inc.*, 290 F.3d 1199, 1205 (9th Cir. 2002).
>
> As a result of this unambiguous language, federal courts have enforced the right of subcontractors to collect on payment bonds after they have completed their work on a federal project, **especially in the face of attempts by sureties to delay litigation.** A principal context in which this has arisen is in connection with conditional payment clauses (or "pay-if-paid" and "pay-when-paid" clauses) in subcontracts.[ ] As discussed earlier, these contract clauses generally condition payment by the prime contractor to the subcontractor on receipt of payment to the prime contractor by the owner. *See MidAmerica Constr.*, 436 F.3d at 1261–62.

***

Courts that have held conditional payment clauses unenforceable have emphasized the Miller Act's unambiguous right to sue after completion of a project and the passage of time.

***

Consistent with this view, federal courts have also held that a surety may only enforce a conditional payment clause in the subcontract if there is a clear and explicit waiver of Miller Act rights in the subcontract. *Walton Tech.,* 290 F.3d at 1208–09 (noting that a waiver of Miller Act rights must be "clear and explicit"); *DDC Interiors,* 895 F.Supp. at 272 ("Right to sue under the Miller Act may be waived by clear and express provisions in the contract between the prime contractor and the subcontractor.") (citing *U.S. for Use of B's Co. v. Cleveland Elec. Co. of S.C.,* 373 F.2d 585, 588 (4th Cir. 1967)).

Grunley argues that the reasoning of *Tusco, Inc.* is inapplicable here.

At the outset, Grunley makes much of the fact that in *Tusco, Inc.*, it was the contractor's surety, not the contractor, that sought the stay. ECF 16 at 7. I can discern no reason why an attempt by a contractor to rely on a conditional payment clause to delay litigation against a surety should fare any differently.

Moreover, Grunley overlooks that in *Tusco, Inc.* the court denied the general contractor's motion to stay as to the breach of contract and quantum meruit claims. Judge Messitte said: "At least one court has expressly held that the Miller Act would also preclude enforcement of conditional payment clauses by *general contractors*, not just sureties." *Tusco, Inc.*, 235 F. Supp. 3d at 753, n. 10 (emphasis in *Tusco, Inc.*) (citing *U.S. for Use of Ackerman v. Holloway Co.*, 126 F. Supp. 347, 348 (D.N.M. 1954)). To be sure, the court observed that "[t]he rulings of other courts are less clear with respect to this issue." *Tusco, Inc.*, 235 F. Supp. 3d at 753, n. 10 (citing *Walton Tech., Inc.*, 290 F.3d at 1205–08; *U.S. for Use of DDC Interiors, Inc. v. Dawson Const. Co.*, 895 F. Supp. 270, 273 (D. Colo. 1995), *aff'd*, 82 F.3d 427 (10th Cir. 1996)). But, Judge Messitte reasoned: "The unusual result of allowing the general contractor but not the surety to enforce a conditional payment clause may be a distinction without a difference, given that general contractors are usually named as intervening parties in Miller Act suits and must

ordinarily indemnify their respective sureties if they have been found liable on a payment bond."
*Tusco*, *Inc.*, 235 F. Supp. 3d at 753, n. 10.

The reasoning of *Zurich American Insurance Co.*, *supra*, 99 F. Supp. 3d 543, is also persuasive. In that case, a government contractor, Nason Construction, Inc. ("Nason"), and its surety, Zurich American Insurance Company ("Zurich"), argued that the suit "should be stayed until the completion of the Prime Contract's disputes resolution process between Nason and the [Veterans Administration ('VA')]". *Id.* at 549. In particular, Nason and Zurich sought a stay "because Zurich's liability is 'derivative' of Nason's and Nason's liability is being determined in the CDA proceeding." *Id.* at 550. Noting that "a subcontract term that conflicts with the Miller Act is ineffective in a suit against the surety on the payment bond", the court rejected this argument. *Id.* at 550. The court concluded, *Zurich Am. Ins. Co.*, 99 F. Supp. 3d at 550: "The Miller Act entitles [the subcontractor] to bring suit ninety days after the completion of its work on the Project, 40 U.S.C. § 3133(b), not when and if Nason recovers from the VA….Conditioning [the subcontractor's] right to recover from the Payment Bond on the completion of Nason's CDA process would be inconsistent with the terms of the Miller Act."

Grunley also argues that *Tusco*, *Inc.* is distinguishable because the Subcontract contains a "'no damages for delay'" clause. ECF 16 at 8. The clause provides in part that the "Subcontractor shall only be entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner or others". ECF 1-2, Article 12. Grunley maintains that courts have concluded that "no damages for delay" clauses are permissible under the Miller Act and that "a surety can rely on a 'no damages for delay' provision as a defense because such provisions affect the measure of damages that would become due under the Miller Act." ECF

16 at 8 (citing *Morganti National, Inc. v. Petri Mechanical Co., Inc.*, No. 3:98CV309 (SRU), 2004 WL 1091743 at *11 (D. Conn. May 13, 2004)).

In *Morganti National*, *Inc.*, 2004 WL 1091743, the district court determined that unlike a "'pay when paid' clause", a clause precluding the recovery of any damages for delay does not conflict with the Miller Act. This determination was based on the court's view that in *Walton Technology, Inc.*, the Ninth Circuit's "concern was only with defenses regarding the *timing* of payment, because the "Miller Act specifies its own time period within which a claim may be brought." *Id.* 2004 WL 1091743, at *11 (emphasis in original).

In my view, *Walton Technology, Inc.*, 290 F.3d 1199, does not support the conclusion in *Morganti National, Inc.* In *Walton Technology, Inc.* the Ninth Circuit did not solely discuss a clause that affects the timing of payment. Rather, the Ninth Circuit said, *id.* at 1207 (italics in original; bold added):

> Considerable differences exist between a case in which the ***measure of recovery*** in a Miller Act case is determined by reference to subcontract terms governing how work performed under the subcontract will be compensated and one in which the **timing of recovery**, and, in some cases, **the right of recovery** under the Miller Act is dictated by such terms. **Where subcontract terms effect the timing of recovery or the right of recovery under the Miller Act, enforcement of such terms to preclude Miller Act liability contradict the express terms of the Miller Act**.[]

The Ninth Circuit also provided illustrations regarding the distinction between a permissible clause that affects the measure of payment versus an impermissible clause that affects the timing or right of recovery under the Miller Act. Of significance, the court described the "'pay when and if paid clause'" at issue in the case as an impermissible "implied waiver" of the subcontractor's rights under the Miller Act. *Id.* at 1208. To illustrate subcontract clauses that affect the measure of recovery in a Miller Act case, the Ninth Circuit cited *United States ex rel. Woodington Electric Co. v. United Pacific Insurance,* 545 F.2d 1381 (4th Cir. 1976)

(determining that pursuant to the terms of the subcontract, a subcontractor's compensation in a Miller Act case could be measured by a share of profits, rather than in term of the costs of labor and material) and *Taylor Construction, Inc. v. ABT Service Corp.,* 163 F.3d 1119, 1123 (9th Cir. 1998) (concluding that under the subcontract's savings clause, the subcontractor in a Miller Act case could recover savings realized on the project, in addition to the costs of labor and materials, because the subcontractor could recover "the agreed upon amount....").

The conditional payment clauses at issue in this case are similar to the clause that the Ninth Circuit found impermissible in *Walton Technology, Inc.* Unlike the clauses at issue in *Woodington Electric* and *Taylor Construction*, which affect *how* compensation was to be measured, the clauses at issue here would affect Aarow's right of recovery.

Grunley insists that it "does not contend that Aarow 'waived' its Miller Act rights" and that "granting a stay does not mean that Aarow has waived its Miller Act rights." ECF 24 at 5, n. 3. But, these assertions conflict with Grunley's arguments in its Motion to Stay and its Reply–Stay. According to Grunley's own arguments, if the contracting officer denies Grunley's "Certified Claim and Request for Final Decision," (ECF 1-3), Aarow would not be entitled to damages for delay under the terms of the Subcontract. This clearly affects Aarow's right of recovery, and not just the measure of recovery. *See, e.g.*, ECF 16 at 8-9 ("Aarow is owed no damages unless and until the…contracting officer determines that Aarow is entitled to additional costs or—if the…contracting officer denies Aarow's claim and Grunley and Aarow decide to appeal that decision—a Board of Contract Appeals so finds."); *id* at11 ("[T]he contractually bargained for dispute resolution process will finally settle the matter because, again, the Subcontract explicitly states that Aarow is not entitled to damages for delay unless Grunley recovers the damages from the Government."); ECF 24 at 4 ("[T]he Subcontract here explicitly

states that Aarow has no damages against Grunley unless and until Grunley gets paid by the Owner.").

Under Grunley's own interpretation of the Subcontract, Aarow would have no right to bring its Miller Act claim if the dispute resolution process under the CDA results in a determination that Grunley is not entitled to recover for the additional costs incurred by Aarow. *See Foundation Fence, Inc. v. Kiewit Pacific Co.*, 09CV2062 DMS JMA, 2010 WL 4024877, at *5 (S.D. Cal. Oct. 13, 2010) (concluding that certain provisions of a subcontract operated as "an implied waiver" of the subcontractor's right to bring suit under the Miller Act because the subcontractor would not have a right to bring his claim after exhausting the dispute provisions of the subcontract.); *see also United States v. Safeco Ins. Co. of Am.*, No. 5:13-CV-00009-TBR, 2013 WL 5970435, at *3 (W.D. Ky. Nov. 8, 2013) (stating that a "no-damage-for-delay clause" is "void under the Miller Act" because it "effectively amounts to a waiver of [the subcontractor's] right to bring an action on the payment bond."). But, in the context of a Miller Act suit, the Subcontract provisions that condition payment to Aarow on payment from the Government to Grunley operate as an "implied waiver" of Aarow's rights under the Miller Act.

A waiver of rights under the Miller Act cannot be implied. Rather, a waiver must be "'clear and explicit.'" *Walton Tech., Inc.*, 290 F.3d at 1205; *see Tusco*, *Inc.*, 235 F. Supp. 3d at 757.

Congress amended the Miller Act in 1999 in the Construction Industry Payment Protection Act of 1999, adding a new subsection entitled "NONWAIVER OF RIGHTS." Pub. L. No. 106–49, § 2(b), (c), 113 Stat. 231, August 17, 1999. It provides, 40 U.S.C. § 3133(c):

 (c) A waiver of the right to bring a civil action on a payment bond required under this subchapter is void unless the waiver is—

    (1) in writing;

(2) signed by the person whose right is waived; and

(3) executed after the person whose right is waived has furnished labor or material for use in the performance of the contract.

"Section 3133(c)(3) specifically provides that a subcontractor can waive its Miller Act rights only *after* it has furnished labor or material for use in the performance of the contract." *Zurich Am. Ins. Co.*, 99 F. Supp. 3d at 549 (emphasis in original). "The purpose of Section 3133(c)(3) was to prevent prime contractors from requiring that subcontractors waive their Miller Act rights as a precondition to obtaining work on federal projects." *Id.* "[T]he requirement that any waiver be executed after completion of the subcontractor's work would be meaningless if general contractors could simply craft subcontract provisions that effectively preclude Miller Act suits." *United States ex rel. Glass, Inc. v. Patterson,* No. 12–2634, 2014 WL 442853, at * 3 (E.D. Pa. Feb. 4, 2014). Accordingly, a waiver executed prior to the provision of labor and materials to the project is void. *See Zurich Am. Ins. Co.*, 99 F. Supp. 3d at.

Grunley does not argue that the Subcontract contained an explicit waiver of Aarow's Miller Act rights, nor could it. None of the Subcontract provisions makes any "express reference" to Aarow's rights under the Miller Act. *See Tusco*, *Inc.*, 235 F. Supp. 3d at 760, n. 20; *see also DDC Interiors, Inc.*, 895 F. Supp. at 274 ("At a minimum, an effective waiver of Miller Act rights must include mention of the Miller Act and unambiguously express intention to waive the rights provided by it. No such language is found in the contract documents before me.").

Moreover, the subcontract was executed at the beginning of the Project, on or about December 26, 2013, prior to Aarow rendering any labor or materials to the Project. *See* ECF 1-2;

ECF 14-1 at 8 (proposed counterclaim). At this juncture, Grunley may not rely on the conditional payment clauses of the Subcontract to delay the Miller Act suit against its sureties. [7]

Grunley also argues that allowing the litigation to proceed could lead to inconsistent decisions and duplicative, costly litigation. ECF 16 at 10-11. Courts have rejected similar arguments in Miller Act cases. For example, in *Zurich American Insurance Co.*, 99 F. Supp. 3d 543, *supra*, the prime contractor and its surety argued, as Grunley does here, that liability was being determined by the CDA proceeding and "that they will be prejudiced in the absence of a stay due to the costs of dual litigation and the risk of inconsistent decisions." *Zurich Am. Ins. Co.*, 99 F. Supp. 3d at 550. The court was "not overly troubled by these arguments," however. *Id.* It noted: "Ordinarily the fact that a prime contractor has a claim for the same amount pending under the 'disputes clause' of the prime contract, does not affect Miller Act cases." *Id.* (internal quotation marks omitted) (citing cases).

The court also emphasized that the risk of inconsistent results between litigation and the CDA process was a risk placed by Congress on prime contractors. It said, *id.* at 550-51 (citation omitted):

> "[T]he obligation to pursue and to exhaust administrative remedies ... is the prime contractor's obligation alone, and any conflict between these divergent remedies constitutes a business risk which the parties incur by virtue of their different contracts." *B's Co.,* 373 F.2d at 588. Moreover, it is a risk Congress imposed by placing the CDA's exhaustion requirement on prime contractors while granting subcontractors the right to sue ninety days after completion of their work.[]

Because the CDA process involved only the prime contractor and the Veterans Administration, and because the VA had "no jurisdiction" over the amount the prime contractor had to pay the subcontractor and "no interest" in how that amount must be determined, the court denied a stay. *Id.* at 551. According to the court, "a stay would subject [the subcontractor] to a

---

[7] I express no opinion on the merits of the parties' claims.

substantial, indefinite delay as [the prime contractor's] claim passes through the administrative process...only to be left at the end of that process to begin again here to litigate its rights against [the prime contractor]." *Id.* at 551.

Judge Messitte reached the same result in *Tusco, Inc.*, relying on *Zurich American Insurance Co.* He said, 235 F. Supp. 3d at 759-760 (emphasis in *Tusco*, *Inc.*; alterations added):

> The Court is not "overly troubled" by [the surety's] arguments that allowing the litigation to proceed could lead to inconsistent decisions and duplicative, costly litigation. *See id.* There is no reason why a dispute resolution process between [the prime contractor] Clark and the Government should delay [the subcontractor] Tusco's ability to litigate its statutory entitlement to seek payment.[] The risk of inconsistent results between that process and this litigation is a risk that the prime contractor must bear—transferring the risk of nonpayment for work performed from the subcontractor to the prime contractor is one of the purposes of the Miller Act. *See DDC Interiors*, 895 F.Supp. at 272 ("[T]he purpose of the payment bond required under the Miller Act is to 'shift the ultimate risk of nonpayment from workmen and suppliers to the surety.' ") (quoting *Am. Sur. Co. of New York v. Hinds*, 260 F.2d 366, 368 (10th Cir. 1958)).

Indeed, the court in *Tusco, Inc.* was troubled by "the potential effect of a lengthy dispute resolution process on Tusco's right to reimbursement for the change order work." *Id.* at 760. It said, *id.*: "As a matter of fairness, the Court finds it concerning that the subcontractor might be forced to wait months or even years to get paid for its work." The court observed that neither the government nor the contractor had "an economic interest in how much Tusco is ultimately reimbursed for the change order work…." *Id.* It said, *id.*:

> If, for example, the Government agrees to pay Clark *less* than the total amount claimed by Tusco for the change order work, there is no provision in the Subcontract that obligates Clark to negotiate favorable terms for Tusco, nor does the Government have any particular interest in the amount of Tusco's ultimate payments. In the event of a settlement which, hypothetically, leaves Tusco with fifty, twenty-five, or even zero percent of what it claims it is owed, Tusco may be able to contest this result against Clark in some forum, but must it wait an indefinite amount of time (until the dispute resolution process is complete) to do so?[]

Notably, "cases in which stays have been granted involved explicit terms written into the subcontract directly addressing the subcontractor's right to pursue a claim before completion of the CDA process." *Zurich Am. Ins. Co.*, 99 F. Supp. 3d at 551 n. 3; *see United States v. Dick/Morganti,* No. 07–02564, 2007 WL 3231717, at *1 (N.D. Cal. Oct. 30, 2007) (stating that subcontractor "agree[d] *... to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted"* ) (emphasis in original); *United States ex rel. Trans Coastal Roofing Co. v. David Boland, Inc.,* 922 F. Supp. 597, 598 (S.D. Fla. 1996) (stating that subcontractor "agree[d] to stay an action or claim against [the contractor's Miller Act bond] pending the complete and final resolution of the Prime Contract's contractual remedial procedure.") (alteration in original).

The Miller Act permits Aarow to bring suit against the sureties 90 days following the completion of its work, without regard to whether Grunley's claim against the Government has been resolved pursuant to the CDA. The CDA process does not justify a stay of Aarow's case. Moreover, the Subcontract does not contain "unambiguous language" that "provides for a stay.…" *Dick/Morganti*, 2007 WL 3231717, at *2. And, a stay would be inconsistent with the plain text and congressional purpose of the Miller Act.

### III.    Conclusion

For the foregoing reasons, Grunley's Motion to Intervene (ECF 14) shall be granted, but its Motion to Stay (ECF 16) shall be denied. A separate Order follows, consistent with this Memorandum Opinion.

Date: August 24, 2017                                  _____/s/_____
                                                                    Ellen Lipton Hollander
                                                                    United States District Judge